UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TASHELIA BOBBITT, MISTY LATURNUS,
SONYA PARKER, KIMBERLY DAVIS,
TERRIE BUCHANAN, SHERITA FRAZIER,
NICOLE ROSSITER, LONJA ALLEN, and
DIANE POHL, on behalf of themselves and
a class of all those similarly situated,

             Plaintiffs,                       Case Number 07-10742

v.                                      Honorable David M. Lawson

ACADEMY OF COURT REPORTING, INC.,
and DELTA CAREER EDUCATION CORP.,

             Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

The plaintiffs in this case, current and former students at the Michigan campus of the

Academy of Court Reporting (Academy), brought suit against the defendants, the Academy and its

parent company, Delta Career Education Corporation (Delta), on a theory of fraud. The plaintiffs

allege that the Academy duped them into enrolling into programs for court reporting and other law-

related vocations by representing that it would confer upon them associate's degrees, when it in fact

had no authority to confer such degrees. The plaintiffs also allege that the Academy misrepresented

to them graduation and job placement rates and salary figures. The plaintiffs have moved to certify

a class of approximately 2,000 current and former students. The motion was argued by the parties

in open court on April 3, 2008, along with the defendants' motion to dismiss counts 1 and 8 of the

second amended complaint alleging violations of the Michigan Consumer Protection Act and the

Michigan Authentic Credentials in Education Act. The Court denied the motion to dismiss from the

bench and has since denied a motion to reconsider that decision. The class certification motion was

taken under advisement, and the Court granted the defendants leave to file a supplemental brief to address additional exhibits the plaintiffs filed in support of their position. The Court now finds that, despite the claims that the defendants' misrepresentations were oral and not written, the plaintiffs have alleged that the defendants' conduct was part of a calculated and uniform scheme perpetrated by the Academy's directors and, coupled with other allegations in the second amended complaint, the plaintiffs have satisfied the prerequisites to certify a class under Federal Rule of Civil Procedure 23(b)(3). The Court, therefore, will grant the motion to certify the case as a class action.

I.

In their second amended complaint, the named plaintiffs, Tashelia Bobbitt, Kimberly Davis, Terrie Buchanan, Sherita Frazier, Nicole Rossiter, Lonja Allen, Diane Pohl-Kress, and Beatrice McKinney, assert ten counts against the defendants on behalf of themselves and all others similarly situated. The counts are based on (1) violations of the Michigan Consumer Protection Act, (2) fraud, (3) negligent or innocent misrepresentation, (4) breach of contract, (5) promissory estoppel, (6) unjust enrichment/breach of quasi-contract, (7) equitable estoppel, (8) violations of the Michigan Authentic Credentials in Education Act, (9) "concert of action," and (10) civil conspiracy. The putative class includes all those individuals "who are now or have been enrolled as students at the Academy's Michigan campus from early 2000 to the present to pursue associate degrees from the Academy's Michigan campus," Sec. Amend. Compl. at ¶ 19, which the plaintiffs believe amounts to more than 2,000 persons. The Academy's Michigan campus, located first in Southfield and later in Clawson, offers programs in court reporting, paralegal work, private investigation, and legal secretarial work. The Academy is an Ohio corporation with its principal place of business in that state; Delta is a Delaware corporation and is the parent company of the Academy.

The thrust of the plaintiffs' case centers on the allegation that the Academy misrepresented to prospective students its ability to grant valid associate's degrees. The plaintiffs do not allege that the defendants reduced these misrepresentations to writing. However, they do contend that the oral misrepresentations were the product of a calculated and uniform scheme hatched by the Academy's directors. According to the plaintiffs, the fraudulent plan (what they term the "Associate Degree Scheme") was launched by the then-owners and controllers of the Academy, Kenneth Endres, Michael Endres, and Dennis Hagestrom (the "Endres parties"). The Endres parties maintained the scheme until they left their positions following the sale of the Academy in 2006.

It appears to be undisputed that the defendants lacked authority to grant associate's degrees from the Michigan campus, although apparently the defendants are authorized by the State of Ohio to grant such degrees to those students who pursued at least a part of their studies at the defendants' facilities located in that State. The plaintiffs allege that the defendants' representatives told prospective students that they would receive associate's degrees upon completing their program of study at the Michigan campus, but since the defendants lacked such authority, they refrained from reducing those representations to writing in order to perpetrate the scheme. The plaintiffs claim that the Endres parties implemented this scheme in early 2000, despite advice that it was unlawful, in order to promote enrollment. According to the plaintiffs:

> 95.    The Academy systematically represented to prospective and current students that the Academy's Michigan campus had authority to grant associate degrees and told students that receipt of an associate degree from the Academy's Michigan campus would provide them with numerous benefits, including a competitive edge in the job market and the ability to utilize the associate degree in the pursuit of further higher education, such as a bachelor's degree.
>
> . . .
>
> 97.    Academy employees and agents who have made misrepresentations to students at the Academy's Michigan campus regarding the degree-granting

authority of the Academy's Michigan campus have included Jay Krause, who is director of the Academy's Michigan campus; Norman Rice, who is dean of education at the Academy's Michigan campus; Cvetko Ostroznik, who was dean of legal studies at the Academy's Michigan campus; Kimberly Garbey, who is director of "admissions" at the Academy's Michigan campus; Darlita Berry, who is an "admissions" representative at the Academy's Michigan campus; Trish Costanzo, who also is an "admissions" representative at the Academy's Michigan campus; and JDerrick Wood, who also is an "admissions" representative at the Academy's Michigan campus, and numerous others.

98.     As a result of fraudulent statements made by the Academy, Plaintiffs and more than 2,000 other current and former students enrolled or continued enrollment from early 2000 to the present in programs of study at the Academy's Michigan campus that the Academy represented would result in the Academy's Michigan campus granting of a Michigan associate degree upon the successful completion of the programs of study.

. . .

100.    Pursuant to the Associate Degree Scheme, the Academy's Michigan campus systematically issued documents purporting to be Michigan associate degrees to graduates of programs of study at the Academy's Michigan campus. Upon information and belief, at least 200 persons who successfully completed programs of study at the Academy's Michigan campus were presented with documents purporting to be Michigan associate degrees, including Plaintiffs Kimberly Davis, Sherita Frazier, Terrie Buchanan and Nicole Rossiter.

Sec. Amend. Comp. at ¶¶ 95-100.

At some point in time, the defendants apparently realized that their practices might expose them to legal difficulties. Therefore, according to the plaintiffs, the defendants developed a plan that would offer them the ability to plausibly claim that the representations concerning associate's degrees were not actually false. The scheme, premised on the Academy's authority to grant associate's degrees at its Ohio campuses, utilized a number of tactics to make it seem as though students at the Michigan campus had actually received their degrees from the Akron, Ohio campus. For instance, "the Academy internally pretended that at least one required course for each student pursuing as associate degree at the Academy's Michigan campus – the student's apprenticeship or

internship course . . . – was completed 'through the Academy's Akron campus' under the supervision of a faculty member at the Academy's Akron campus more than 200 miles away." *Id.* at ¶ 108. The plaintiffs allege that in reality, however, "students at the Academy's Michigan campus consistently completed their apprenticeship and internship courses with no contact whatsoever by the Academy's Akron campus or a faculty member at the Academy's Akron campus." *Id.* at ¶ 110. The Academy also pretended to transfer credits earned by students at the Michigan campus to the Akron campus, but the Academy never informed students of this procedure, and in fact never had authority to make such transfers from either State and failed even "to complete documents purporting to transfer credits." *See id.* at ¶ 118. During graduation ceremonies, which were held in Troy, Michigan, students were identified as graduates of the Michigan campus, and the Academy identified these students as such in various documents. As a result, graduates frequently would represent that they had received an associate's degree from the Academy's Michigan campus, since they had no reason to believe that their degrees were not legitimate or that they were somehow connected with Ohio.

The cover-up plan allegedly took another turn in 2006, just prior to the transfer of ownership of the Academy to Delta. According to the plaintiffs, the Academy and Delta jointly "devised, but did not disclose to prospective and current students, a new plan requiring all students at the Academy's Michigan campus to travel to and complete courses at the Academy's Akron, Ohio campus as a new requirement for successful completion [of] a course of study for which they would earn an associate degree." *Id.* at ¶ 229. The defendants did not disclose this new requirement (the "New Akron Requirement") until mid-January 2007. In fact, Dean Krause allegedly lied to students in 2006 to quell rumors about the new plan, informing them that they would not have to go to Akron

to obtain an associate's degree. "As a result, hundreds of students continued to borrow money and pay tuition in late 2006 and early 2007 based on the Academy's fraudulent representations that upon successful completion of a course of study at the Academy's Michigan campus, the Academy's Michigan campus would grant an associate degree." *Id.* at ¶ 233.

In mid-January 2007, "the Academy first distributed a document to students setting forth the New Akron Requirement and disclosed to students at the Academy's Michigan campus that associate degrees can only be earned after completion of courses at the Academy's Akron campus." *Id.* at ¶ 235. Nevertheless, the degrees under this program are still not authorized by the State of Michigan; they are sanctioned only by Ohio. According to the plaintiffs, the Academy's adoption of the New Akron Requirement "reveal[s] that its previous representations to students . . . regarding the attainability of a Michigan associate degree following the successful completion of a course of study at the Academy's Michigan campus were fraudulent." *Id.* at ¶ 240. However, the New Akron Requirement has affected the named plaintiffs and other class members in different ways. Some of the plaintiffs were still enrolled when the new program was announced:

> As a result of the New Akron Requirement, students, including[] Plaintiffs Tashelia Bobbitt . . . , Kimberly Davis, Lonja Allen, Beatrice McKinley, Misty Laturnus and Sonya Parker[,] were required to incur additional expense, hardship, debt and/or delay in order to pursue associate degrees that the Academy had previously represented could be attained at the Academy's Michigan campus through the successful completion of a program of study at the Academy's Michigan campus.

*Id.* at ¶ 241. Others had already graduated:

> Through the New Akron Requirement, the Academy has revealed that it had no authority to issue to graduates of the Academy's Michigan campus documents purporting to be associate degrees, as it did to . . . more than 200 persons from early 2000 to the present. Plaintiffs Kimberly Davis, Terrie Buchanan, Sherita Frazier and Nicole Rossiter are among the students from the Academy's Michigan campus who were presented with documents purporting to be associate degrees from the Academy's Michigan campus.

*Id.* at ¶ 243.

In addition to the Academy's misrepresentations regarding its degree-granting authority, the plaintiffs allege the Academy falsely inflated other institutional attributes, such as graduation and job placement rates, average income rates, and career services. For instance, the plaintiffs aver that the Academy informed prospective students that it had "placed greater than 90 percent of its graduates in . . . legal-related jobs," when in fact the rate was far lower. *Id.* at ¶¶ 137, 141. In addition, the Academy told its court reporting students that they could expect to make salaries that were simply unrealistic.

The plaintiffs allege that they relied to their detriment on the Academy's misrepresentations because they would not have enrolled in the program had they known the truth and, as a result, they would not have given up other opportunities or incurred substantial student debt.

Of course, the plaintiffs also allege that the Academy realized substantial profits from its wrongdoing. According to the plaintiffs, if it were not for the Academy's misrepresentations, especially those regarding its ability to grant associate's degrees, it would have attracted far fewer students.

In the discovery that has taken place thus far, all of the named plaintiffs have testified that Academy officials represented to them that they would receive associate's degrees upon successfully completing their programs in Michigan. Plaintiff Denise Davis testified that Jay Krause, director of the Michigan campus, convinced her to leave another court-reporting program because it, unlike the Academy, could not confer an associate's degree. Her affidavit reads as follows:

> 4. In or about August 1998, I visited the Academy and met with Jay Krause . . . . Mr. Krause compared the Academy's program with the one I had been pursuing at Elsa Cooper. . . .

5.      One of the differences that Mr. Krause explained to me was that the Academy would grant me an associate degree following my successful completion of the program in Michigan, while Elsa Cooper would not. Mr. Krause told me that I could use the associate degree from the Academy to go on and attain a bachelor's degree from another school.

6.      . . . . Mr. Krause's statements to me about the opportunity to earn a Michigan associate degree played a huge part in my decision to go the Academy and to leave Elsa Cooper.

Br. in Supp., Ex. 7, Aff. of D. Davis at ¶¶ 4-6.

The testimony of Kevin Johnson, who is not a named plaintiff, is similar. Johnson says that he enrolled in the Academy's paralegal program in 2002. Prior to enrollment, Johnson spoke with Kimberly Garbey, an officer in the admissions office, who told Johnson that he "would receive an associate degree after completing the paralegal program in Clawson." Br. in Supp., Ex. 7, Aff. of K. Johnson at ¶ 5. Garbey also represented to Johnson "that the school had a placement rate of more than 90 percent for its students." *Ibid.* Despite graduating *magna cum laude*, however, Johnson could not find a legal-related job; he works as a custodian at the post office.

The testimony of the other named plaintiffs (and certain class members) is much the same, and need not be recited here in detail. Suffice it to say that they all testified they met with Academy officials who represented that they could earn Michigan associate's degrees from the Clawson campus. *See* Br. in Supp., Ex. 8, Aff. of C. Jones at ¶ 5; Ex. 9, Aff. of F. Hollowell at ¶ 4; Ex. 10, Aff. of E. Smith at ¶ 2; Ex. 11, Aff. of S. Graves at ¶ 5; Ex. 12, Aff. of B. Portis at ¶ 6; Ex. 13, Aff. of K. McPherson at ¶ 2; Ex. 14, Dep. of L. Allen at 40-41, 46; Ex. 15, Dep. of T. Bobbitt at 48; Ex. 16, Dep. of S. Frazier at 155; Ex. 17, Dep. of K. Davis at 22-23. They all relied on these representations in deciding to enroll. Aff. of C. Jones at ¶ 6; Aff. of F. Hollowell at ¶ 4; Aff. of E. Smith at ¶ 2; Aff. of F. Graves at ¶ 8; Aff. of B. Portis at ¶ 6; Aff. of K. McPherson at ¶ 2   Some,

but not all, of the named plaintiffs also were told by Academy officials that the Academy had 90%-plus placement rates. *See* Aff. of C. Jones at ¶ 5; Aff. of S. Graves at ¶ 5; Aff. of K. McPherson at ¶¶ 2-3. This last allegation is substantiated by a document that the Academy released in 2005 summarizing placement rates. The summary ends with the following representation: "Placement History[:] 97.6% from 1970 through 2005[.] 3595 graduates seeking jobs[;] 3511 found jobs!" Br. in Supp., Ex. 13, Placement Summary.

On the other hand, the defendants observe that none of the plaintiffs can recall the exact wording of the representations, nor can they point to written representations of a similar nature (i.e., representing that Clawson students would receive Michigan associate's degrees). When Kim Davis was asked about the particulars of the misrepresentations, she responded as follows:

> Q. Now, what – how did you come to believe that what you were signing up for was an associate's degree program in paralegal.
> . . .
> A. Okay. I was told from Kim and Trish.
> Q. Kim and Trish. Okay. Kim who?
> A. I don't remember her last name.
> . . .
> A. They were an admission director.
> Q. And do you know Trish's last name?
> A. No, don't remember it.
> . . . [shows document]
> Q. Does that refresh your recollection as to what Trish's last name was?
> A. Yes.
> Q. What was it, as best you can remember, that Trish Costanzo told you about an associate's degree program?
> A. She told me that once I finished the program, receive an associate's degree. No diploma was ever mentioned, about getting a diploma, because I would not have stayed if it was a diploma. I don't remember exactly everything, but that was the main thing I remember.
> . . .
> Q. Did you get anything in writing saying that you were enrolled in an associate's degree program?
> A. Don't remember.
> . . .

A. . . . . She did not mention nothing as far as going to Akron, Ohio or anything like that.

Resp. Br., Ex. 14, Dep. of K. Davis at 22-23, 78. This exchange is representative of the other plaintiffs' testimony as well. *See, e.g.,* Resp. Br., Ex. 15, Dep. of T. Buchanan at 126 ("Q. And, at that point, your belief that you would get an associate's degree from the Academy of Court Reporting in Michigan came from the statement Norman Rice had made to you at the open house. A. Yes."); *id.* at 277 ("What I believe is that they didn't live up to their obligation of giving me an associate's degree from the State of Michigan."); Resp. Br., Ex. 17, Dep. of T. Bobbitt at 212 ("Q. Okay. . . . [Did] someone tell you . . . that upon completion of the diploma program at the Michigan campus, the Academy's Michigan campus would grant you an associate degree? A. Not in those words, but yes.").

To be sure, the Academy's course catalog and the enrollment agreements signed by the plaintiffs did not expressly indicate that the Academy had the ability to grant Michigan associate's degrees. The catalog lists the following accreditation and approval information:

ACCREDITATION

Accredited by the Accrediting Council for Independent Colleges and Schools (ACICS) to award:

■   Diploma Program:
    Court Reporting          Private Investigation
    Paralegal                Legal Secretary

■   Certificate Program:
    Paralegal                Legal Administrative Assistant
    Scopist

APPROVALS

■   Clawson Branch is approved by the State of Michigan

- ■ Approved by the National Court Reporters Association (NCRA)

- ■ Approved by the Michigan Department of Labor and Economic Growth for the training of VA eligible students

- ■ Diploma in          * Court Reporting
  * Paralegal
  * Legal Secretary

- ■ Certificate in        * Scopist
  * Paralegal
  * Legal Administrative Assist.

Resp. Br., Ex. 1, Catalog at 17. The enrollment agreements signed by the plaintiffs stated that they were enrolling in "diploma" programs, and did not mention the attainability of an associate's degree. *See, e.g.,* Resp. Br., Ex. 2, Enrollment Agreement of S. Frazier.

Nevertheless, other documents produced by the Academy bolster the claim that the school represented it had degree-conferring authority. For instance, in 2002, Director Krause wrote a letter of recommendation on behalf of a Clawson student stating that she "received her Associate Degree in Paralegal Studies." Br. in Supp., Ex. 18, Letter of Rec. Similarly, Cvetko Ostronik, Dean of Legal Studies, wrote a letter in 2005 thanking an attorney for hosting a student as his intern, a requirement "for graduation in the Paralegal Associate of Applied Business program." Br. in Supp., Ex. 19, Thank-you Letter. *See also* Br. in Supp., Ex. 20, Letter of Verification (verifying that a student was enrolled in school and would ultimately "receive an Associate in Applied Business Degree").

However, as alleged in the plaintiffs' complaint, the Academy's scheme was not static. Although the plaintiffs allege that they were told the Academy could and would grant them associate's degrees approved by Michigan, certain documents show otherwise. As early as 2000, the Academy implemented a policy whereby it would ostensibly have the ability to grant associate's

degrees by virtue of its authorization to do so in Ohio. The original policy called for Southfield students (before the campus was moved to Clawson) to transfer their credits to the Akron campus and take a course "through" that campus. However, they would never actually have to set foot in Ohio. The Academy described the concept as follows:

> When a student enrolls at the Southfield branch in the Court Reporting or Paralegal DIPLOMA program, he/she will, at the same time, enroll in the corresponding ASSOCIATE DEGREE program through the Akron branch. The student will then complete the program as usual at the Southfield branch, except for the AP102 (Apprenticeship) or AP103 (Internship). When the student is ready to take one of these courses, the course will be run out of the Akron Branch (i.e. supervised and graded by the appropriate Akron Dean (Court reporting or legal)[)]. Upon completion of all requirements (to include the AP courses), the student will request a transfer of credits to the Akron Branch. Upon approval of this transfer by the Akron Branch, the Akron Branch will issue an Associate Degree certificate to the student.
> . . .
> Upon receipt of the final transcript of grades from the Akron Education Director, the Southfield director can then order the appropriate Associate Degree diploma. Remember, the AA diploma must state that it came from the Akron branch.

Br. in Supp., Ex. 25, March 7, 2000 Associate Degree Policy at 2-3. Despite this language, the diplomas received by Michigan students made no reference to Ohio, and graduation ceremonies were held in Michigan.

On July 25, 2006, the Academy formally changed its policy. The new policy differed drastically in that it required Clawson students to actually attend classes in Akron during their final quarter. The Academy explained the policy to students as follows:

- The Academy of Court Reporting, Inc. is licensed by the State of Ohio to award associate degrees in applied business for students who complete the court reporting, paralegal (117 credit) and private investigation programs.

- Clawson students may earn an associate degree if they elect to take the transfer option during their last quarter at the Academy.

<u>HERE'S HOW THE TRANSFER OPTION WORKS</u>

- Students enrolled in the Court Reporting Diploma Program, Paralegal Program, and Private Investigation Program are eligible.

- Students who are two quarters from graduation will be notified they are eligible for the transfer option.

- Students who select the option will sign an enrollment agreement for the Akron Branch.

- Students will be scheduled for their internship and one final class at the Akron Branch during their last quarter. The classes will be scheduled for Saturday.

- The Academy will provide students with free transportation to the Akron Branch every Saturday.

- Students who take the transfer option will transfer to the Akron Branch of the Academy of Court Reporting.

- To receive an associate degree the student must pass all of his/her classes with a minimum grade of "C."

Ex. 26, New Akron Requirement at 3.

Although State of Michigan representatives did not object to this policy outright, an official contacted the Academy to stress that it must make this procedure clear to students at the Clawson campus. In a letter dated September 14, 2006, an officer of the Department of Labor and Economic Growth wrote as follows:

> As you know, the Academy of Court Reporting is not authorized by the State of Michigan to grant degrees but may issue diplomas or certificates to students. Therefore we concur with your correspondence of July 28, 2006 that provides a letter of instruction . . . detailing the transfer option for Michigan students to your Akron, Ohio campus in order to receive an Associate degree. Effective immediately, an addendum to your school catalog containing this letter of instruction must be provided to all current and prospective students. All future publications of your school catalog must also contain this information.

Sept. 14, 2006 Letter from State of Michigan Dept. of Labor. Later, in August 2007, the Department of Labor informed the Academy that the State required more information to assess the propriety of its policy, particularly the older policy that did not require students physically to attend classes in Ohio. *See* August 1, 2007 Letter from State of Michigan Dept. of Labor at 2 ("We have also learned that for some time ACR may have been issuing associates degrees to its Michigan students even though these students never physically attended classes or otherwise completed any coursework in Ohio. Essentially, the ACR may have used the authority granted by the State of Ohio to hand out associate degrees to its students attending in the State of Michigan.").

The plaintiffs also offer evidence of the uniformity of the defendants' practice of misrepresenting the Academy's authority to grant associate's degrees in Michigan. For instance, the plaintiffs point to an email sent by Norman Rice, Dean of Education at the Academy's Clawson campus, sent to an official at the Academy's headquarters in August 2006. Pls.' First Supp. Exs., Ex. 1, Aug. 2006 Rice Email and List at 1. Rice attached a list of Clawson graduates and asked the official to "prepare and send all certificates, diplomas, and associate's degrees" to the Academy's Clawson campus. *Ibid.* The attached list identified each student and the "degree" they were to receive. *Id.* at 2-5. Most of the students were to obtain an "associate of applied business" in a specified field (e.g., paralegal studies). *Ibid.* A similar email and list were sent in December 2006 and again in September 2007. *See* Pls.' First Supp. Exs., Ex. 1, Dec. 2006 and Sept. 2007 Rice Emails and Lists.

In addition, the plaintiffs offer the deposition testimony of Jderrick Wood, an admissions employee for the Academy. Wood testified that he was informed during employee training that associate's degrees were available through the Clawson campus. He learned that "they had several

-14-

programs, certificate, diploma and associate's, and . . . if you wanted to pursue the associate's, then that was an option." Pls.' First Supp. Exs., Ex. 2, Wood Dep. at 74.  Although he could not recall the exact words, Wood said a supervisor told him the school was accredited and "you could obtain an associate's degree." *Id.* at 75.

The plaintiffs also point to an email by the dean of Northwood University, Rhonda C. Anderson.  Pls.' First Supp. Exs., Ex. 3, Anderson Email.  Northwood had an "articulation agreement" with the Academy whereby it recognized the degrees purportedly earned by Academy students.  Upon hearing of this lawsuit, however, Anderson sent an email informing other administrators of her decision to rescind the agreement. *Ibid.*  In the same vein the plaintiffs cite the deposition testimony of Northwood's 30(b)(6) representative, Donald E. Hunkins. Pls.' First Supp., Exs., Ex. 4, Hunkins Dep.  Hunkins confirmed that Anderson voided the articulation agreement because "Northwood assumed the Academy of Court Reporting had the authority to issue associate['s] degrees in the State of Michigan," and that assumption proved false. *Id.* at 17.

The defendants filed a supplemental exhibit consisting of a portion of Jderrick Wood's deposition testimony that was not included by the plaintiffs.  The defendants contend this testimony shows that the representations concerning associate's degrees were not uniform.  However, although Wood's testimony shows he knew relatively little about the process, it actually tends to establish the opposite.  Wood testified that he first learned about the degree option during training. *See id.* at 76-77.  Prior to 2006, Wood took the following approach with students:

> Q.  Okay.  And when you started meeting with prospective students in 2005 to discuss the para – the private investigation program, would the topic of associate degrees arise in your meetings with them?
> A.  Occasionally.
> Q.  And when it did arise, what would you tell them about associate degrees and the Academy?

A.  That that is an option.

Q.  And did you tell them more specifically what one could do to earn an associate degree?

A.  No.

Q.  Did you have any more specific knowledge about how one earned an associate degree?

A.  No, not at that time.

Q.  You just told them in 2005 during meetings when it would arise, that it was an option to get an associate degree at the Academy.

A.  Yes.

Defs.' Supp Exs., Ex. B, Wood dep. at 78-79.  Wood testified that the protocol changed slightly in 2006.  At that point in time, Wood was instructed to tell students that earning an associate's degree was an option, but then refer the inquiring students to Jay Krause, director of the Clawson campus.

## II.

According to Federal Rule of Civil Procedure 23, a matter may proceed as a class action in the name of representative parties if (1) the class is so numerous that joinder of all members is impracticable;  (2) there are questions of law and fact common to the class; (3) the claims and defenses of the representative parties are typical of the claims and defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (citing Fed. R. Civ. P. 23(a)); *Olden v. LaFarge Corp.*, 203 F.R.D. 254, 268 (E.D. Mich. 2001), *aff'd* 383 F.3d 495 (6th Cir. 2004).  These factors are normally referred to as numerosity, commonality, typicality, and adequacy of representation.

A class must meet all of the above prerequisites plus one of those listed in Federal Rule of Civil Procedure 23(b) to be certified.  *Amchem Prods., Inc.*, 521 U.S. at 614; *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998).  The movant bears the burden of establishing that all prerequisites for class certification are satisfied.  *Thompson v. County of Medina*, 29 F.3d 238, 241 (6th Cir. 1994).

When reviewing a motion for class certification, the Court must conduct a "rigorous analysis" of the requirements of Rule 23. *Sprague*, 133 F.3d at 397 (quoting *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982)). The Court considers but is not bound to accept the allegations on the face of the complaint, and it will examine the discovery that is presented at the time the motion is adjudicated. *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974) ("[O]rdinarily, the determination should be predicated on more information than the pleadings will provide.").

It is against these considerations that the Court measures the plaintiffs' motion to certify the following class:

> A class of all individuals who started or continued in a paralegal, court reporting, or private investigation program requiring completion of more than 100 credits at the Academy of Court Reporting in Michigan at any time from 2000 to present.

The plaintiffs argue that they meet all the requirements of Rule 23(a), and they seek certification under Rule 23(b)(3). As for Rule 23(a), they contend that numerosity is satisfied because the proposed class consists of more than 2000 current and former students, rendering joinder impracticable. As for commonality, the plaintiffs observe that, although there need only be *a* common question of law or fact, here there are many. The most salient issues in this case – whether the Academy represented that it could and would confer associate's degrees to graduates of its Michigan program, and whether this was a misrepresentation – pertain to all of the class members. Similarly, the claims of the representative parties are typical of the claims of the class, they argue, because the challenged conduct is collective in nature and the misrepresentations were part of a systematic attempt to draw students into the programs by promising results that the defendants were not capable of delivering. Finally, the plaintiffs contend that the adequacy-of-representation element

is met because "all the representative parties' interests are aligned with the interests of all class members in obtaining redress for the Academy's actions." Pls.' Br. in Supp. of Mot. to Cert. Class at 22. The plaintiffs contend that they meet the requirements of Rule 23(b)(3) because (1) common questions predominate; and (2) a class action is superior to other methods of adjudication.

The defendants do not contest the numerosity requirement, but they insist that the plaintiffs have not demonstrated commonality, typicality, or adequacy of representation. Their argument rests on the view that oral representations of fraud will not support a collective-type action because the circumstances of the named plaintiffs vary greatly, and their claims are based on individual reliance on differing oral representations. The defendants believe that the plaintiffs' testimony precludes the claim that they relied on uniform conduct that affected class members across the board. The defendants rely heavily on the Sixth Circuit's decision in *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998), where the court disapproved certification of a class in a fraud claim in which the plaintiffs each claimed reliance on oral representations of a variety of representatives of the defendant. With respect to adequacy of representation, the defendants contend that this element is lacking because (1) there is antagonism between the interests of the named plaintiffs and the interests of the class members, (2) the named plaintiffs are only concerned with their own claims, and (3) some of the named plaintiffs lack credibility. The defendants also contend that the named plaintiffs cannot represent a class adequately in the Michigan Authentic Credentials in Education Act (MACE) claim because of an inherent conflict of interest. According to the defendants, the MACE claim asks the Court to rule that associate degrees issued by the Academy during the class period are invalid (and therefore are "false credentials" in violation of the Act), but a class-wide judgment to that effect would be injurious and antagonistic to those class members who want their

degrees to remain valid. Finally, the defendants vigorously contest the contentions that common issues predominate among the class members and that class adjudication would be a superior mode of proceeding.

A.

The first prerequisite to class certification under Rule 23(a) is numerosity. *Olden v. LaFarge Corp.*, 203 F.R.D. 254, 268 (E.D. Mich. 2001), *aff'd* 383 F.3d 495 (6th Cir. 2004). There is no strict numerical test to determine when the class is large enough or too numerous to be joined under the Federal Rules of Civil Procedure. *Senter v. General Motors Corp.*, 532 F.2d 523 n.24 (6th Cir. 1976). It is plain that the plaintiffs have satisfied the numerosity requirement with a class estimated to comprise approximately 2,000 individuals, and the defendants do not contest this point.

The defendants vigorously contest the plaintiffs' contentions that they have satisfied the commonality and typicality requirements of Rule 23(a). Their argument is based on the simple premise that the oral representations made to prospective students and the students' subjective reliance thereon are so individualized that there can be no claim that is common or typical among the class members. The defendants posit, therefore, that fraud claims based on oral representations rarely, if ever, can be the subject of a class action. In support of that argument, the defendants cite *Stout v. J.D. Byrider*, 228 F.3d 709 (6th Cir. 2000), *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998), and *Yadlosky v. Grant Thornton*, 197 F.R.D. 292 (E.D. Mich. 2000).

As a general matter, the second prerequisite for class certification – commonality – simply means that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This provision does demand that all questions of law and fact raised in the complaint are common. *Olden*, 203 F.R.D. at 269. "The standard is not [that] demanding. 'Rule 23(a) simply requires *a*

common question of law or fact.'"  *Rockey v. Courtesy Motors, Inc.*, 199 F.R.D. 578, 583 (W.D. Mich. 2001) (quoting *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 884 (6th Cir. 1997)).

The prerequisite of typicality requires that a "sufficient relationship exist[] between the injury to the named plaintiff and conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct."  *Stout*, 228 F.3d at 717 (internal quotes omitted). Although the named plaintiffs' claims must fairly encompass the class members' claim, they need not always involve the same facts or law.  *See Sprague,* 133 F.3d at 399; *Senter*, 532 F.2d at 525 n.31.

The Supreme Court has explained that the commonality and typicality requirements "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff[s]' claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982).  "The test for typicality, like commonality, is not demanding."  *Rockey*, 199 F.R.D. at 584.

However, in *Sprague*, the Sixth Circuit, sitting *en banc*, found that the district court abused its discretion by certifying a class action involving 50,000 General Motors retirees who claimed the company unlawfully changed the terms of their health care benefits.  The theory of liability was that the class members entered into a bilateral contract with General Motors to receive lifetime benefits as part of their agreement to take early retirement, and General Motors breached that contract when the benefit package was changed.  Although the case started out with claims based on the company's general practice, the district court did not certify the class until it had ruled on and dismissed many of those claims, leaving only the allegations that rested on proof of individual reliance by each class

member upon representations by a variety of company representatives at multiple sites across the

Midwest. The court of appeals explained:

> The issues that remained after *Sprague I* were anything but common. *Sprague I*, as we have said, permitted the early retirees to proceed on a bilateral contract theory and an estoppel theory. Neither theory was susceptible to class-wide treatment. The premise of the bilateral contract theory was that GM had made an individual "side deal" with each early retiree. Each putative side deal involved any pertinent document the retiree might have signed – and the statements of acceptance, as we have seen, said nothing more about health insurance than that the early retiree accepted the "applicable" benefits – as well as any pertinent representations GM might have made to the retiree, whether orally, in writing, or both. A retiree might have signed a "long form" statement of acceptance, or a "short form," or a "statement of intent" to retire, or nothing at all. He might have heard GM officials speak about the special early retirement program at a group meeting, or might have seen a program summary compiled by GM, or might have had a one-on-one meeting with his supervisor or with a GM benefits person. He might have retired from a particular plant in a particular division and been given a particular set of representations, or he might have retired from a different plant in a different division and been given a completely different set of representations. Proof that GM had contracted to confer vested benefits on one early retiree would not necessarily prove that GM had made such a contract with a different early retiree.

> The plaintiffs' estoppel theory was even less susceptible to class-wide treatment. An estoppel claim requires proof of what statements were made to a particular person, how the person interpreted those statements, and whether the person justifiably relied on the statements to his detriment. . . . Because of their focus on individualized proof, estoppel claims are typically inappropriate for class treatment. . . .

> GM's statements to the early retirees were not uniform. Among other things, the statements varied (1) based on the person making the representation, (2) based on the particular special early retirement program that applied, (3) from facility to facility, and (4) from time to time. Given the wide variety of representations made, there must have been variations in the early retirees' subjective understandings of the representations and in their reliance on them. . . .

> Given these myriad variations, it seems to us that the plaintiffs' claims clearly lacked commonality. . . . Because each plaintiff's claim depended upon facts and circumstances peculiar to that plaintiff, class-wide relief was not appropriate.

*Sprague*, 133 F.3d at 398. The court held that typicality was lacking for similar reasons: because

the named plaintiffs' claims (like those of the other class members) were based on unique

communications, it could not be said their claims encompassed those of the class. *Id.* at 399 (noting that "[a] named plaintiff who proved his own claim would not necessarily have proved anybody else's claim. . . . The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class").

Two years after *Sprague*, the Sixth Circuit decided *Stout v. J.D. Byrider*. The named plaintiffs in that case were two individuals who had purchased automobiles from a used car dealership who claimed that the dealership had committed fraud by selling them cars with concealed damage. The plaintiffs asserted counts for fraud, and violation of the Truth in Lending Act (TILA) and the Ohio Consumer Sales Practices Act (OCSPA), and they sought to represent a class comprising all persons who purchased vehicles at the dealership from 1993 to the present. The Sixth Circuit affirmed the denial of class certification because typicality and adequacy of representation were not present and that common issues did not predominate over individual ones. There was a lack of uniformity in the dealings of the individual plaintiffs with the dealership. Each used car purchase was a discrete transaction involving different representations by the defendant's agents, different service agreements, and different levels of reliance. Since the fraud and TILA claims required an individual assessment of each transaction, with potentially differing results, the court concluded the district court did not abuse its discretion by not certifying a class action.

The third case cited by the defendants, *Yadlosky v. Grant Thornton*, involved a district court's refusal to certify a class of individuals at the behest of an investor who alleged that the defendants (officers and directors of MCA Financial Corporation, two accounting forms, and ten securities brokers) conspired to commit securities fraud by misrepresenting MCA's financial condition and, thus, the value of its securities. The proposed class was comprised of approximately

2,300 people who bought securities from the defendant over a thirteen-year period. In alleging common law fraud (among other things), the plaintiff argued that all class members were entitled to a presumption of reliance by virtue of "his allegations of a general scheme to defraud, accomplished, in part, by the dissemination of the same written offering materials to 'virtually all' class members." *See Yadlosky*, 197 F.R.D. at 297. The court found that these written representations were not in fact at the heart of the case, because the plaintiff himself testified his action was prompted by oral statements.

The defendants cite this case for the proposition that "[c]lass action status is usually inappropriate where oral representations are relied upon to support fraud claims, due to the highly individualized nature of the statements." *Id.* at 299. However, the court identified an exception to this rule "where a standard presentation was made to all the members of the class." *Ibid.* (citing *Kaser v. Swann*, 141 F.R.D. 337, 339 (M.D. Fla. 1991)). The court found this exception inapplicable because the plaintiff in that case had "sued ten separate brokers/dealers that allegedly made misrepresentations to 2811 individual investors over the course of thirteen years." *Ibid.* Nevertheless, the case demonstrates that there is no immutable rule prohibiting class certification in fraud cases premised on oral misrepresentations.

In fact, the Sixth Circuit approved class certification in an oral fraud case in *Bittinger v. Tecumseh Products Co.*, 123 F.3d 877 (6th Cir. 1997), which involved an employer's termination of retirement benefits. The company terminated its fully-funded health care benefit program and informed its workers that they could only receive partially-funded benefits. Eligibility for the new plan was conditioned on signing a release that waived all claims against the company; some class members signed releases but others did not. Those that did sought to vitiate the release based on

misrepresentations supposedly made by the defendant. That feature did not disqualify the case from class action treatment. The court explained:

> Tecumseh argues that the representations of company management on which the plaintiffs rely (most but not all of which were oral) were not uniformly communicated to all class members. All this may be true, but it does not disqualify the class under Rule 23(a). The plaintiffs' evidence appears to follow a pattern, and the people they claim made the representations are largely the same people. More importantly, Bittinger – like each class member – contends that Tecumseh originally planned to provide lifetime, fully-funded benefits to retirees, as a general matter. That the evidence varies from plaintiff to plaintiff would not affect this basic claim (though the district court correctly notes that individual estoppel claims might be affected). *See In re American Medical Systems*, 75 F.3d at 1083 (holding that named plaintiffs' claim is typical if it arises from the same course of conduct).

*Id.* at 884-85.

If the plaintiffs in this case had premised their right to recover solely on a claim of fraud, supported only by oral representations made by a variety of individuals, the defendants' argument that no class member's claim would be typical and there are no common questions of law would have more force. But the plaintiffs in this case have alleged multiple causes of action in their second amended complaint, some of which do not require proof of reliance. For instance, in Count 1 the plaintiffs plead a violation of the Michigan Consumer Protection Act (MCPA), which prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." Mich. Comp. Laws § 445.903(1). A plaintiff injured as a result of an MCPA violation is entitled to damages and attorney's fees under section 445.911(2), and section 445.911(3) specifically authorizes MCPA class actions. In *Dix v. American Bankers Life Assurance Co.*, 429 Mich. 410, 415 N.W.2d 206 (1987), the Michigan Supreme Court held that a statutory misrepresentation claim under the MCPA does not require a showing of reliance. *Id.* at 418, 415 N.W.2d at 209 ("We hold that members of a class proceeding under the Consumer Protection Act

need not individually prove reliance on the alleged misrepresentations. It is sufficient if the class can establish that a reasonable person would have relied on the representations. Further, a defendant's intent to deceive through a pattern of misrepresentations can be shown on a representative basis under the Consumer Protection Act.") (footnote omitted).

The claim under the Michigan Authentic Credentials in Education Act (MACEA), Mich. Comp. Laws § 390.1601 *et seq.* in Count 8 does not require proof of reliance either. MACEA provides that "[a] person shall not knowingly issue or manufacture a false academic credential in this state." Mich. Comp. Laws § 390.1603. There is no element of relaince or fraud apparent from the text of this statute; a person suffering a violation of MACEA may bring a civil action and "may recover costs, reasonable attorney fees, and the greater of either the person's actual damages or $100,000.00." Mich. Comp. Law § 390.1605

On the other hand, the plaintiffs' claims for fraud, negligent misrepresentation, promissory estoppel, and equitable estoppel found in Counts 2, 3, 5, and 7 require a showing of some measure of reliance. *See Belle Isle Grill Corp v. Detroit*, 256 Mich. App. 463, 477, 666 N.W.2d 271, 280 (2003) (fraud); *Law Offices of Lawrence J. Stockler, P.C. v. Rose*, 174 Mich. App. 14, 44 (1989) (negligent misrepresentation); *Novak v. Nationwide Mut. Ins. Co.*, 235 Mich. App. 675, 686-87, 599 N.W.2d 546, 552 (1999) (promissory estoppel); *Minerva Partners, Ltd. v. First Passage, LLC*, 274 Mich. App. 207, 218, 731 N.W.2d 472, 479 (2007) (equitable estoppel). However, each of these counts also requires proof that the defendants promised to confer associate's degrees and that they had no legal authority to do so. And although the defendants argue that proof of the false promise requires individualized proof, the Court is satisfied that the plaintiffs have put forth allegations and evidence that "appears to follow a pattern, and the people they claim made the representations are

-25-

largely the same people." *Bittinger*, 123 F.3d at 895. Inasmuch as commonality "simply requires *a* common question of law or fact," *id.* at 884, the Court has little trouble determining that this element is satisfied. Similarly, judging from the conduct alleged by the named plaintiffs the Court concludes that there is a "sufficient relationship . . . between the injury to the named plaintiff and conduct affecting the class." *Stout,* 228 F.3d at 717. Therefore, typicality is established as well.

The defendants also challenge the ability of the named plaintiffs to represent the class because (1) there is antagonism between the interests of the named plaintiffs and the interests of the class members, (2) the named plaintiffs are only concerned with their own claims, and (3) some of the named plaintiffs lack credibility. The antagonism argument asserts that the overarching injury alleged by the plaintiffs is that the defendants represented they had degree-granting authority when they did not; the lawsuit presupposes that the "degrees" are invalid. However, if the plaintiffs win that point, more than 200 members of the putative class would have the so-called associate's degrees they earned nullified. The argument that the individual plaintiffs are not concerned with the claims of unnamed class members is based on deposition testimony by the named plaintiffs that they were speaking only for themselves. The credibility argument is directed to two of the named plaintiffs; the defendants contend that Kim Davis lied about her qualifications and Lonja Allen misrepresented her marital status to obtain financial aid.

"Interests are antagonistic when there is evidence that the representative plaintiffs appear unable to vigorously prosecute the interests of the class." *Stout*, 228 F.3d at 717 (internal quotes omitted). Certainly class certification is unwarranted in circumstances where the interests of class representatives and class members are antagonistic. *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996). To show adequacy of representation, after all, the named plaintiffs must

-26-

demonstrate that they will fairly and adequately protect the interests of the class. The central theme of the case is that the defendants never have had the authority to grant degrees in Michigan; this claim is not a feature of the case that is unique to the named plaintiffs. If there are others who do not subscribe to this theory, those persons can be accommodated through the opt-out procedure that is required under Rule 23(b)(3).

The Court does have some concern that some of the named plaintiffs do not appear to understand their roles. However, it appears that this deficiency comes from a lack of information, not some inherent conflict or inability. The Court is satisfied that if class counsel explains the nature of the lead-plaintiff role in detail, the named plaintiffs will accept their charge and appreciate its significance.

The defendants' attempt to impeach the credibility of plaintiff Lonja Allen consists of pointing out that she lied about her marital status when completing a financial aid document. However, the plaintiff's testimony is that an Academy official told her to list that she was separated, even though she was actually not, because that would "be best . . . for [her] financial situation." Resp. Br., Ex. 18, Allen Dep. at 34. The defendants' impeachment attempt is more successful with respect to Kim Davis. Davis admitted that she submitted a document representing that she had completed various hours at a law firm when in fact she had not. *See* Dep. of K. Davis at 49-50. However, the foibles of a single class representative do not disqualify the named plaintiffs as a group or render their representation inadequate.

Finally, the defendants do not contest the competency of class counsel, and the Court is satisfied that they are qualified to prosecute the action.

The Court concludes, therefore, that all the requirements of Rule 23(a) have been satisfied.

The plaintiffs in this case have chosen to proceed with their request for class certification under Rule 23(b)(3).  In addition to the requirements specified in Rule 23(a), therefore, the plaintiffs must show that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  According to the Rule, the following matters are pertinent to these issues:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

The defendants' argument that Rule 23(b)(3) cannot be satisfied is two-fold: they contend that common questions will not predominate because of the individual nature of the fraud-related claims, and the circumstances of the respective plaintiffs vary.  For instance, Tashelia Bobbitt is presently taking courses in Akron, *see* Resp. Br., Ex. 17, Dep. of T. Bobbitt at 137; other plaintiffs received their diplomas before the New Akron Requirement, *see* Br. in Supp., Ex. 21, Diploma of T. Buchanan (dated Sept. 27, 2003); Ex. 22, Diploma of K. Davis (dated March 29, 2003); and still others chose to drop out, one before the New Akron Requirement was announced, *see* Resp. Br., Ex. 19, Exit Interview Data re D. Pohl, and another shortly thereafter, *see* Resp. Br., Ex. 18, Dep. of L. Allen at 122-23.  The defendants also believe that the damage claims will vary widely among the plaintiffs and are highly individualized.

The Sixth Circuit recently explained the predominance test as follows:

> "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." [*Amchem Prod., Inc. v.*] *Windsor*, 521 U.S. [591,] 632 [(1997)]; *see also In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir.2001). To satisfy the predominance requirement in Rule 23(b)(3), "a plaintiff must establish that 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof.'" *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 136 (quoting *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000) (internal quotation marks omitted)). Further, "the fact that a defense 'may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.'" *Id.* at 138 (quoting *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000)). Lastly, "[c]ommon issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues."

*Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (2007). As this Court has noted, the fact that damages may be individual in nature is typically not a problem since the Court can bifurcate the issue of liability from the issue of damages. *Olden*, 203 F.R.D. at 271 (citing *Little Caesar Enters., Inc. v. Smith*, 172 F.R.D. 236, 267 (E.D. Mich.1997)). "Once liability is found, the issue of damages can be decided by a special master or by another method." *Ibid.* Although the predominance requirement is more difficult to satisfy than commonality under Rule 23(a), the predominance requirement is met if the common question identified "is at the heart of the litigation." *Powers v. Hamilton Co. Public Defenders Commission*, 501 F.3d 592, 619 (6th Cir. 2007). Accordingly, "[c]ases alleging a single course of wrongful conduct are particularly well-suited to class certification." *Ibid.*

With respect to superiority, the Sixth Circuit has observed that this may be satisfied where the potential recovery for individual members is prohibitively small. *See Beattie*, 511 F.3d at 566-67 (citing *Windsor*, 521 U.S. at 617). However, Rule 23(b)(3) is designed "not solely as a means for assuring legal assistance in the vindication of small claims but, rather, to achieve the economies of

time, effort and expense." *In re Am. Med. Sys., Inc.*, 75 F.3d at 1084 (internal quotes omitted). The manageability of a class action is important in assessing whether these interests would be served, and hence, whether a class action is superior to other available methods. *See* Fed. R. Civ. P. 23(b)(3)(D); *Beattie*, 511 F.3d at 567. This "manageability" factor "encompass[es] the 'whole range of practical problems that may render the class action format inappropriate for a particular suit.'" *Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d 1014, 1023 (11th Cir. 1996) (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974)). The problems may include cases which "break[] down into an unmanageable variety of individual legal and factual issues." *Ibid.*

For many of the reasons discussed earlier assessing the commonality and typicality elements, the Court believes that common issues will predominate. The central allegation of the plaintiffs' case is that Academy officials represented that the Academy could and would grant them associate's degrees approved by the State of Michigan. Although the plaintiffs may not remember the exact words and some of the details may differ from student to student, the thrust of the misrepresentation remains the same. The Sixth Circuit has approved class certification when this is the case. *See Bittinger*, 123 F.3d at 884 ("Finally, Tecumseh argues that the representations of company management on which the plaintiffs rely (most but not all of which were oral) were not uniformly communicated to all class members. All this may be true, but it does not disqualify the class under Rule 23(a). The plaintiffs' evidence appears to follow a pattern, and the people they claim made the representations are largely the same people. More importantly, Bittinger – like each class member – contends that Tecumseh originally planned to provide lifetime, fully-funded benefits to retirees, as a general matter. That the evidence varies from plaintiff to plaintiff would not affect this basic

claim."). The common issues in the case plainly predominate over any individual issues that might arise.

Because class issues predominate, the Court finds that the class action format is a superior method of adjudicating the claims of potentially 2,000 individuals. The prospect of individual damage determinations – "a common feature of class actions routinely dealt with at a remedial phase," *Bittinger*, 123 F.3d at 885, – does not change that assessment. In *Olden v. LaFarge Corp*, 383 F.3d 495 (6th Cir. 2004), the Sixth Circuit rejected the argument that the specter of manifold individual damage determinations destroyed the predomination of the liability question. That case concerned a lawsuit brought by homeowners against the owner of a cement manufacturing plant alleging property and personal damages as a result of emissions. The defendant argued that "individual issues related to establishing causation will overwhelm the case because toxins: (a) originated from disparate sources *within* the one-square mile Lafarge facility *and perhaps* other industrial sources; (b) were dispersed to properties in varying concentrations; (c) allegedly caused a variety of personal injuries; and (d) allegedly caused widely varying property damages." *Id.* at 508 (internal quotes omitted). However, the court concluded that the defendant's arguments

> may suggest that individual *damage* determinations might be necessary, but the plaintiffs have raised common allegations which would likely allow the court to determine liability (including causation) for the class as a whole. . . .
>
> As the district court properly noted, it can bifurcate the issue of liability from the issue of damages, and if liability is found, the issue of damages can be decided by a special master or by another method. Fed. R. Civ. P. 23(c)(4)(A); *see also Simon v. Philip Morris Inc.*, 200 F.R.D. 21, 30 (E.D.N.Y. 2001) ("By bifurcating issues like general liability or general causation and damages, a court can await the outcome of a prior liability trial before deciding how to provide relief to the individual class members."). Therefore, the aforementioned minor complaints can be dealt with in the damages phase if necessary, and it is likely premature to address these issues at this point.

*Id.* at 508-509.

Similarly, the questions of causation and damages in this case can be addressed later in the proceedings by means of a special master, representative trials, or other means. However, because the liability issue predominates, this case falls easily into the category of "cases in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Products, Inc.*, 521 U.S. at 615 (internal quotes omitted).

The Court concludes, therefore, that class certification under Rule 23(b)(3) is appropriate.

III.

The Court finds that the plaintiffs have satisfied all the requirements of Federal Rule of Civil Procedure 23(a) and the provisions of Rule 23(b)(3).

Accordingly, it is **ORDERED** that the plaintiffs' motion for class certification [dkt # 43] is **GRANTED**. The determination of class certification is conditional and may be altered or amended prior to the decision on the merits in light of any changes in circumstances that make such action advisable. *See* Fed. R. Civ. P. 23(c)(1).

It is further **ORDERED** that pursuant to Federal Rule of Civil Procedure 23(b)(3), the following class is certified in this cause:

> A class of all individuals who (a) started or continued in a paralegal, court reporting, or private investigation program requiring completion of more than 100 credits at the Academy of Court Reporting in Michigan at any time from 2000 to present, and (b) were told by Academy officials prior to enrollment that they could earn a Michigan associate's degree.

It is further **ORDERED** that counsel of record for the named plaintiffs in this matter, namely George Googasian, Esquire, Dean Googasian, Esquire, and Thomas Howlett, Esquire, shall be appointed counsel for the designated class.

It is further **ORDERED** that the plaintiffs shall, at their expense, provide appropriate notice to all class members via first-class mail and in conformance with the requirements of Rule 23 of the Federal Rules of Civil Procedure. The notice shall provide putative class members until **August 7, 2008** to notify the counsel for the parties and the Court of their intent to opt out of the proposed class. The notice shall also provide that class members wishing to enter their own appearance in the matter through counsel shall do so by that same date.

It is further **ORDERED** that the parties shall confer and forward to the Court on or before **May 15, 2008** an agreed document that will be used to serve notice upon all members of the class. If the parties are unable to agree on the proper text for said notice, the parties shall forward on that date the plaintiffs' proposed text along with a detailed list of objections from the defendant. The notice shall not be sent until Court approval is given.

It is further **ORDERED** that the parties appear for a Case Management and Scheduling Conference on **May 27, 2008 at 2:00 p.m.**

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: May 1, 2008

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 1, 2008.

s/Felicia M. Moses
FELICIA M. MOSES