UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TASHELIA BOBBITT, MISTY LATURNUS,
SONYA PARKER, KIMBERLY DAVIS,
TERRIE BUCHANAN, SHERITA FRAZIER,
NICOLE ROSSITER, LONJA ALLEN, and
DIANE POHL, on behalf of themselves and
a class of all those similarly situated,

     Case Number 07-10742
     Honorable David M. Lawson

    Plaintiffs,

v.

ACADEMY OF COURT REPORTING, INC.,
and DELTA CAREER EDUCATION CORP.,

    Defendants.
_____/

**OPINION AND ORDER SUSTAINING PLAINTIFFS' OBJECTIONS AND OVERRULING DEFENDANTS' OBJECTIONS TO MAGISTRATE JUDGE'S DISCOVERY ORDER REGARDING DISCLOSURE OF PRIVILEGED MATERIAL, VACATING MAGISTRATE JUDGE'S ORDER, AND DENYING DEFENDANTS' MOTION TO COMPEL RETURN OF DISCLOSED MATERIAL**

  This matter is before the Court on the parties' objections to Magistrate Judge Virginia M. Morgan's order granting in part the defendants' motion to compel the return of certain documents – all e-mail communications – that the defendants contend are protected by the attorney-client privilege but were inadvertently disclosed. Judge Morgan held that one of the e-mail documents could be used by the plaintiffs to clarify the testimony of Suzanne Peters, in-house counsel and "compliance officer" for the Academy of Court Reporting, but the remaining e-mail documents were "presumptively" protected by the attorney-client privilege, and inadvertent production did not waive that privilege. The plaintiffs wish to be able to use all of these materials for all relevant purposes. They contend that the magistrate judge erred when she failed to: (1) realize that there was no evidence suggesting inadvertent disclosure; and (2) find that the defendants had waived any

privilege through their inaction, including substantial delay in asserting the privilege claims. The defendants also object to the ruling. They argue that the plaintiffs should not be permitted to use even the single e-mail communication for the limited purpose identified by the magistrate judge, because it too is protected by the attorney-client privilege. After considering the parties' arguments, the Court concludes that the magistrate judge committed clear error. The Court finds that some of the communications are not subject to the attorney-client privilege, and the defendants waived the privilege as to the other documents. Therefore, the Court will sustain the plaintiffs' objections to the magistrate judge's order, overrule the defendants' objections, and deny the motion to compel the return of the documents.

I.

The plaintiffs commenced this class action on behalf of former and current students of the Academy of Court Reporting (the Academy) in early 2007. The original defendants included the Academy, Delta Career Education Corporation (Delta), Gryphon Colleges Corporation, and Gryphon Investors, Inc. (collectively, the "Gryphon entities"). The Academy apparently operated for some time as an independent corporation, but then Gryphon purchased one hundred percent of the Academy's shares in 2006. Delta acquired the Academy later that year and now serves as its parent corporation. The plaintiffs' allegations against Delta and the Gryphon entities initially were tenuous. At a hearing on these defendants' motion to dismiss held in June 2007, the plaintiffs agreed to dismiss the non-Academy defendants and then file an amended complaint if they uncovered a basis for proceeding against one or more of them. The plaintiffs filed an amended complaint a few months later – in November 2007 – naming as defendants only Delta and the Academy. The

plaintiffs brought various counts sounding in fraud, and the Court certified the matter as a class action on May 1, 2008.

In the meantime, the parties were engaging in discovery, which leads to the present dispute. On October 8, 2007, the Gryphon entities (non-parties at the time) produced a handful of documents in response to a subpoena from the plaintiffs. The plaintiffs had served the subpoena in August 2007, and counsel for the Gryphon entities, Christopher Keegan of Kirkland & Ellis LLP, responded on August 27, 2007. Keegan stated in a letter (to which the Academy and Delta's counsel was copied) that he would furnish the requested documents. It appears that at some time during the litigation, the Academy, Delta, and the Gryphon entities were parties to a joint defense agreement. Among the items produced were the e-mail threads that are the subject of the controversy at hand. The e-mail communications consist of three threads, but they are best thought of as falling into two categories or conversations: one that took place in January 2007 and one that took place in February 2007. Both conversations appear to be damaging to the Academy and Delta's defense.

Despite the fact that counsel for the Academy and Delta was apprised of this disclosure, those defendants remained silent for quite some time. In fact, it was the Gryphon entities that first realized the disclosure may have been unwise. On November 13, 2007, Mr. Keegan wrote counsel for the plaintiffs (again sending a copy to Abdu Murray, counsel for the Academy and Delta):

> [A]s you are aware, in response to your third party subpoena to the [Gryphon entities], [the Gryphon entities] produced more than 6,400 pages of email communications and other documents responsive to your seventy-four requests. It has come to my attention that the Gryphon Entities inadvertently produced documents containing attorney-client privileged communications. Specifically the documents bates labeled: GRY005201-5204; GRY005185-5188; and GRY005174-75 are confidential attorney client communications discussing legal advice related to this case. Consistent with paragraph 11 of the Stipulated Protective Order and the case law on inadvertent production of privileged communications, the Gryphon Entities request that you return these documents, including all copies.

> Please destroy any copies that cannot be returned, including, for example, any electronic copies that might have been made, and expunge any document, material or information reflecting or disclosing the contents of these privileged communications.

Pls.' Resp. Br. re Mot. to Comp. [dkt # 79], Ex. 10, Keegan Letter at 1.

The plaintiffs' counsel responded to Mr. Keegan on November 19, 2007, refusing the request for return of the items because: the protective order referred to "confidential information" and said the parties could in fact use such information; "prevailing case law" holds that inadvertent disclosure may constitute a waiver; the communications are not protected by the attorney-client privilege; if they were privileged, the Academy waived the privilege by sending the communications to the Gryphon entities, which are separate corporations; any applicable privilege would be held by the Academy, whose failure to object underscores the idea of waiver; and a claim of *inadvertent* disclosure strains credulity in light of Kirkland & Ellis's extensive review procedures. *See* Resp. to Keegan Letter at 2.

Two days later, the plaintiffs filed their motion for class certification. In their supporting brief, the plaintiffs quoted Suzanne Peter's January 29, 2007 e-mail wherein she expressed her belief that the Academy had wrongly represented its authority to grant associate's degrees. They also referenced an e-mail sent by John Rogers on February 26, 2007 where Rogers opined that it would be wise to separate the plaintiffs from their counsel. Additionally, in their amended complaint filed November 2, 2007, the plaintiffs alluded to the contents of the disputed e-mails. *See* Amend. Compl. at ¶¶ 246-47 ("Delta executives began to communicate about devising ways to 'pry' Plaintiffs 'loose' from their counsel in this action. . . . Joseph Fox . . . had participated in the internal communications at Delta and the Academy during the previous two weeks regarding how to pry

Plaintiffs loose from their counsel."). Following the certification motion, several months passed without a word about the e-mails. The Academy and Delta said nothing about the plaintiffs' reference to the e-mails in their response brief.

The Academy and Delta broke the silence by filing the present motion to compel on March 21, 2008, requesting return of the disputed e-mails and preclusion as to their use. The Court referred the motion to Magistrate Judge Morgan for hearing and decision, and Judge Morgan issued her ruling on May 2, 2008, one day after this Court certified the matter as a class action. As mentioned above, Judge Morgan ordered the plaintiffs to return the e-mail communications of February 2007, but she determined that the plaintiffs could use the January 2007 e-mail thread a limited purpose.

In the e-mail thread approved by Judge Morgan, Ms. Peters responded to a notification sent by Debby Adams, an employee of Delta at the time. Adams informed Peters that she had acquired a new phone, and Peters responded as follows on January 29, 2007:

> I am glad you have a new cell phone. Is the number the same? Also, I just got off the phone with a student in Clawson and I want to give you a heads up. I spoke with this student last week. She was upset about the new associate degree process. I explained everything to her. This morning she called back for clarification. She advised she had been told by un-named staff members that the way we had been awarding the associate degree in the past was "illegal." I told her that was untrue and explained the review process we went through resulting in the change.
>
> She claimed she and other students were thinking about going to the press. I told her we would work with her. I don't know where this is going, hopefully nowhere, but I want you to know there is a potential issue out there.
>
> When Ken and Dennis dreamed this process up back in 2000, I expressed my displeasure especially since we had nothing in writing. I also told Jay and Kim we should not be telling students they were enrolling in an associate degree program when in fact they were not. They told me they would not do so. A year or so ago, I found out they were telling the students they were enrolling in an associate degree program and I complained to Ken very loudly. He made them stop at that point.

> Unfortunately the damage had already been done and students in school who enrolled 2 or more years ago may have been given incorrect information when they enrolled.
>
> It is possible we will have to give some of those students complete refunds if the matter is pushed. If that happens, I think the money should be subtracted from what Gryphon owes Ken since this was a preexisting problem. I don't want any students to leave and my plan is to work with everyone to satisfy them, however I don't want any bad press on this.

Defs.' Objs., Ex. D, Peters Thread at 1-2. There is some disagreement as to whether Peters acted only as in-house counsel for the Academy, or whether she also wore the hat of "compliance officer." The record suggests a mixed role; Peters is an attorney, but she was identified in campus literature as a person students could contact with complaints.

Debby Adams forwarded Peters's message to Joe Fox, president of the Academy and a Delta official, soliciting his thoughts. Fox did not respond to Peters or Adams, but rather sent the following message to Kevin Smith (CEO of Delta), Joe Kennedy (CFO of Delta), and John Rogers (of Gryphon):

> The Michigan Campus of ACR (Clawson) is not approved to offer Associate Degrees. They had/have a process for having students complete their Diploma portion in Clawson, and then "transfer" to Cleveland to get their Assoc. Degree. As you can see from the e-mail [from Ms. Peters], some students feel they were misled regarding the Assoc. Degree program. I will look into this further.

*Id.* at 1.

The other e-mail communications at issue were sent in February 2007. Suzanne Peters learned of the lawsuit shortly after it was filed, and she immediately informed Joe Fox. Word of the case made its way to Kevin A. Smith, CFO of Delta Career Education Corp., who in turn e-mailed David Breach, one of Delta's attorneys. Smith wrote:

> David:

> I received the attached law suit yesterday afternoon and immediately notified Bill Birkhead, our local counsel here in Norfolk with Vandeventor Black. He has contacted Suzanne Peters with ACR to gather additional information regarding this issue and to find out specifically when and where the complaint was served. He has already spoken to Marsh to notify our underwriters. It appears that these claims are related to activities prior to our ownership. If this is correct, we need guidance from your firm regarding the indemnification and escrows that were included in the purchase agreement and how to proceed with regards to the former owners [i.e., Gryphon].

Academy's Reply Br. re Mot. to Compel [dkt # 87], Ex. B, Feb. 2007 E-mail Thread at 1-2.

When John Rogers, a Gryphon official, learned of the lawsuit, he e-mailed Fox, Smith, and Joe Kennedy, CEO of the Academy, on February 26, 2007. Rogers wrote as follows:

> I spoke with Joe Fox to get some background on this. My two cents on this is that we should see it first as a student relationship management issue and second as a legal matter. In other words, if there are things we can do to make these students happy and pry them loose from the attorney who is stirring them up, then that is a better path forward than looking for a legal defense in the event that we end up in court. At that point we have probably lost far more in the form of student morale, bad publicity, etc. Perhaps we can discuss in executive session at the board mtg this week.

*Id.* at 1.

Minutes later, Rogers e-mailed Will Lynn (a partner with Gryphon) and Don Miller (also with Gryphon). David Andrews (Gryphon's founder) and attorney Breach were copied to the e-mail. The message reads:

> Attached is a copy of the lawsuit that we [sic] recently filed against ACR by disgruntled students. I spoke with Joe Fox to get some background. The issue revolves around students who claimed that they were promised an AA degree at a campus that doesn't grant such degrees. The plan according to Suzanne was to have students take a 2 day weekend course at a campus that offers the AA degree as their final course. Apparently this is both legal and acceptable by the accrediting bodies, but the students may be unhappy with that approach. Joe also thought that the final class could probably be offered online by the degree granting campuses. The main issue in the near term is that it got picked up by the local press and is being stirred up by a plaintiffs' attorney, so proactively managing the students will probably

> minimize potential fallout relative to a protracted legal strategy. We should probably discuss this at the board meeting this week in executive session.

*Ibid.*

Although Judge Morgan explained her reasoning in greater detail on the record, her written ruling is brief. Judge Morgan ordered that "[(]1) [t]he e-mail of January 29, 2007 referenced at deposition may be used to clarify testimony of Ms. Peters[;]" and "[(]2) [t]he other two e-mails are presumptively attorney-client privilege[d] and inadvertent disclosure does not waive privilege." Order Granting in Pt. Mot. to Comp. [dkt # 94] at 1-2. With respect to the January communication, Judge Morgan based her ruling on a perceived inconsistency between Peters's statements in the e-mail and her statements during a deposition. The deposition reads in relevant part as follows:

> Q. . . . What I'm asking you is at some point, did you become aware that students, prospective students at the Academy of Court Reporting in Michigan, were being told that they were enrolling in an associate degree program?
> . . .
> [A.] I had received information, and I don't remember even when it was. But over the – you know, I had received information that it was possible that students were being told that they were enrolling in an associate degree program. This information was hearsay information, it was related to me by Mr. Rice. You know, I had no – I was never actually – no student ever told me that. I never sat in on any interviews where that happened or anything. But I – you know, I did receive some information that could indicate that that was the case.

Defs.' Objs., Ex. F, Peters Dep. at 275. In Judge Morgan's view, the e-mail suggested that Peters heard of the misrepresentations directly from a student, while Peters spoke in deposition of hearing it through the grapevine. Therefore, it appears Judge Morgan intended to allow the plaintiffs to use the January e-mail in conjunction with the deposition testimony to determine exactly what Peters heard and from whom she heard it.

Both parties filed timely objections to the magistrate judge's decision.

II.

The district court reviews an order by a magistrate judge on a non-dispositive matter to determine whether the decision is "clearly erroneous." *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001). A decision is "clearly erroneous" if "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948). Where there are two plausible views, a decision cannot be "clearly erroneous." *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 573 (1985).

The plaintiffs object to the magistrate judge's order on the grounds that (1) there is no evidence that the documents were inadvertently produced; (2) the defendants' extended silence following production constituted a waiver of any privilege claims; (3) the e-mail communications themselves evidence a violation of professional ethics and therefore cannot be protected by the privilege; and (4) if the e-mail string from Suzanne Peters is not subject to the privilege, there is no basis to limit its permissible use. The defendants, on the other hand, insist that the e-mails turned over to the plaintiffs' attorneys all are subject to the attorney-client privilege. They contend that they do not have to offer actual evidence of inadvertent disclosure; rather, the Court may find inadvertent disclosure from the circumstances of production. The defendants also take issue with the magistrate judge's allowance of Peters's e-mail string for a limited purpose. They contend that if the document is privileged, it cannot be used for any purpose. Both sides rely on *Fox v. Massey Ferguson, Inc.*, 172 F.R.D. 653 (E.D. Mich. 1995), as authoritative precedent on the issue of inadvertent disclosure.

Federal Rule of Civil Procedure 26 prescribes the general provisions governing discovery:

> Parties may obtain discovery regarding any matter, *not privileged*, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party.

Fed. R. Civ. P. 26(b)(1) (emphasis added). The privilege at issue in this case is the attorney-client privilege. The Sixth Circuit has explained that this privilege "protects from disclosure confidential communications between a lawyer and his client in matters that relate to the legal interests of society and the client." *Ross v. City of Memphis*, 423 F.3d 596, 600 (6th Cir. 2005) (quoting *In re Grand Jury Subpoena (United States v. Doe)*, 886 F.2d 135, 137 (6th Cir.1989)) (internal quotation marks omitted).

The elements of the attorney-client privilege were summarized decades ago by Dean Wigmore as follows:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived.

8 Wigmore, Evidence (McNaughton rev. ed.1961), § 2292, p. 554; *see also Reed v. Baxter*, 134 F.3d 351, 355-56 (6th Cir.1998). The purpose of the attorney-client privilege is to encourage clients to communicate freely with their attorneys. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). It is a matter of common law right, "the oldest of the privileges for confidential communications known to the common law." *Ibid.* But the essence of the privilege is confidentiality, and when confidentiality is destroyed, there is little justification for incurring the heavy cost to the production of relevant evidence which the privilege exacts. *Parkhurst v. Lowten*, 2 Swanst. 194, 216; 36 Eng. Rep. 589, 596 (Ch. 1895) ("The moment confidence ceases, privilege ceases."); *see also In re Grand Jury Proceedings Oct. 12, 1995*, 78 F.3d 251, 254 (6th Cir. 1996). Because the privilege operates

to reduce the amount of information discoverable during the course of a lawsuit, it is narrowly construed. *In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 451 (6th Cir.1983). By voluntarily disclosing an attorney's advice to a third party, for example, a client is held to have waived the privilege because the disclosure runs counter to the notion of confidentiality. *See Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1424 (3rd Cir. 1991) (holding that "voluntary disclosure to a third party of purportedly privileged communications has long been considered inconsistent with an assertion of the privilege.").

Turning first to the question of whether the two e-mail strings were subject to the attorney-client privilege to begin with, it appears that Judge Morgan found at least some parts of the Peters's e-mail satisfied the elements of the privilege. Suzanne Peters apparently was acting in a dual role of counselor and compliance officer. The compliance officer title may be something of a misnomer, however, as her task in that capacity looks like it was limited to managing relations between students and the administration. Nevertheless, at least a portion of the e-mail can be considered protected communication between an attorney and her client, since a part of it alerted Debbie Adams, an agent of Delta (which owns the Academy), to a potential legal issue, and Peters also expressed concern over issues of legal accountability for potential costs or damages that might result. The magistrate judge did not commit clear error in concluding that this e-mail at least qualified as privileged according to its subject matter.

The February 2007 e-mail communications present a closer call. That e-mail thread begins with a message from Kevin Smith, Delta's CFO, to David Breach, one of Delta's attorneys. Smith forwarded a copy of the complaint to Breach, described the nature of the action, and asked for legal advice. *See* Feb. 2007 E-mail Thread at 1-2 ("[W]e need guidance from your firm regarding the

indemnification and escrows that were included in the purchase agreement and how to proceed with regards to the former owners [i.e., Gryphon]."). This communication is obviously privileged.

However, in the next portion of the thread, John Rogers, a Gryphon official, sent an e-mail to Joe Fox, Kevin Smith, and Joe Kennedy, offering his "two cents" on the lawsuit. *Id.* at 1. Attorneys Breach and Birkhead received copies of the e-mail (they were listed on the "cc" line), but they were not listed in the salutation, and it does not appear that the purpose of sending the message was to obtain legal advice from them. According to the Eastern District of California, "[b]ecause of the narrowness of the attorney-client privilege, it is axiomatic that a communication between individuals is not transformed into a privileged one simply by virtue of an attorney being copied on the communication." *Coleman v. Schwarzenegger*, 2008 WL 2468492, *4 (E.D. Cal. 2008) (citing *In re Gabapentin Patent Litig.*, 214 F.R.D. 178, 186 (D.N.J. 2003)); *but see In re New York Renu with Moistureloc Product Liability Litig.*, 2008 WL 2338552, *10 (D.S.C. 2008) (suggesting that "a 'cc' to an attorney can qualify for the privilege" when the communication is intracorporate "between non-lawyer employees about matters which the parties intend to seek legal advice").

These communications were not "intracorporate." Indeed, it appears that Debbie Adams of Delta shared the message with Joe Fox, president of the Academy, who in turn sent the information to Delta and Graphon officials. Therefore, the conclusion is inescapable that various corporate officials made selective disclosures of these communications to related but separate entities. The final message was sent on February 26, 2007, just minutes after the previous e-mail. Rogers e-mailed Will Lynn and Don Miller (Gryphon executives), and he copied to the e-mail David Andrews (Gryphon's founder) and counsel Breach. Rogers attached a copy of the complaint, and he explained the basic nature of the action. The thrust of Rogers's communication mirrored the

previous message, as he stated that "proactively managing the students will probably minimize potential fallout relative to a protracted legal strategy." Feb. 2007 E-mail Thread at 1. It cannot be said with any certainty that this communication was made to obtain legal advice, but even if it were, the Delta and Academy officials made selective disclosures of the communications to representatives of a separate corporation, Graphon.

Selective waivers of the privilege are disapproved, and they generally result in the destruction of the protection initially provided by the attorney-client privilege. As the Sixth Circuit has explained:

> [A]ny form of selective waiver, even that which stems from a confidentiality agreement, transforms the attorney-client privilege into "merely another brush on an attorney's palette, utilized and manipulated to gain tactical or strategic advantage." *Steinhardt*, 9 F.3d at 235. Once "the privacy for the sake of which the privilege was created [is] gone by the [client's] own consent, . . . the privilege does not remain in such circumstances for the mere sake of giving the client an additional weapon to use or not at his choice." *Green v. Crapo*, 181 Mass. 55, 62, 62 N.E. 956, 959 (1902) (Holmes, J.). "The client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality as to others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit." *Permian*, 665 F.2d at 1221.

*In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 302 -303 (6th Cir. 2002).

The Court concludes, therefore, that the second e-mail string was not protected by the attorney-client privilege because the protection was waived by the disclosure to third parties.

Then there is the question of disclosure resulting from the discovery production by Graphon's attorneys. The attorney-client privilege is not automatically waived in the case of inadvertent disclosure. *United States v. Ary*, 518 F.3d 775, 783 (10th Cir. 2008). Rather, courts consider a variety of factors – generally concerning the diligence of the disclosing party and the

impact of disclosure – to determine whether waiver should be implied. *See ibid.* (explaining that "courts have examined three main factors in determining whether protection has been waived when material has been involuntarily disclosed: (1) the specificity with which the defendant identifies the material; (2) the expediency by which the defendant informs the government that it seized protected material; and (3) the expediency by which the defendant seeks judicial action to enforce the protection."); *Nat'l Wildlife Federation v. EPA*, 286 F.3d 554, 575-76 (D.C. Cir. 2002); *In re Grand Jury Proceedings*, 219 F.3d 175, 188 (2d Cir. 2000); *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 2008 WL 2221841, *5 (D. Md. 2008); *Bus. Integration Servs., Inc. v. AT&T Corp.*, __ F.R.D. ___, ___, 2008 WL 1849755, *9 (S.D.N.Y. 2008). The Sixth Circuit has not addressed the issue. *See United States ex rel. Pogue v. Diabetes Treatment Ctrs. of America, Inc.*, 444 F.3d 462, 467 (6th Cir. 2006) (declining to determine "whether the inadvertent disclosure of the allegedly protected documents constitutes a waiver of the attorney-client privilege and, if it does, what is the scope of such a waiver."). But it has been addressed over the years by district courts in this Circuit. For example, in *United States v. Kelsey-Hayes Wheel Co*, 15 F.R.D. 461 (E.D. Mich. 1954), the defendants in a civil anti-trust case delivered hundreds of documents to the government during discovery. Twenty confidential letters between attorney and client were inadvertently included among these documents. The Court found that the attorney-client privilege was waived, and attributed the inadvertence of counsel to the client.

In this Circuit, a helpful current case is that identified by the parties, *Fox v. Massey-Ferguson, Inc.*, 172 F.R.D. 653 (E.D. Mich. 1995). The *Fox* court looked to the following factors in considering whether inadvertent disclosure resulted in waiver: "(1) the reasonableness of precautions taken in view of the extent of document production, (2) the number of inadvertent

disclosures, (3) the magnitude of the disclosure, (4) any measures taken to mitigate the damage of the disclosures, and (5) the overriding interests of justice." *Id.* at 671 (citing *FDIC v. Ernst & Whinney*, 137 F.R.D. 14, 17 (E.D. Tenn. 1991), *Hydraflow, Inc. v. Enidine, Inc.*, 145 F.R.D. 626, 637 (W.D.N.Y. 1993), *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co.,* 132 F.R.D. 204, 208-09 (N.D. Ind. 1990), and *FDIC v. Marine Midland Realty Credit Corp.*, 138 F.R.D. 479 (E.D. Va. 1991)).

Applying the *Fox* factors leads the Court to the conclusion that waiver occurred as to both e-mail strings. The first factor – "the reasonableness of precautions taken in view of the extent of document production," *Fox*, 172 F.R.D. at 671 – slightly favors the defendants. The record contains little evidence on the precautions taken, but Thomas Howlett, counsel for the plaintiffs, lauded Kirkland & Ellis's document screening procedures. *See* Resp. to Keegan Letter at 2. Of course, Kirkland & Ellis represented the Gryphon entities, so these precautions mean little to whether the Academy and Delta took reasonable precautions.

The second factor is "the number of inadvertent disclosures." *Fox*, 172 F.R.D. at 671. Like the first factor, consideration of this factor would appear to reward diligence and punish carelessness – the more inadvertent disclosures, the more likely waiver becomes. This factor favors neither side.

The third factor follows naturally from the second, relating as it does to "the magnitude of the disclosure." *Fox*, 172 F.R.D. at 671. This factor clearly points in the direction of waiver. The disclosures here are *extremely* relevant to the merits of this case – they speak directly to the validity of the fraud claim. Again, it is worth noting that the disclosures were actually made by the Gryphon entities, not the Academy and Delta. However, Academy and Delta personnel were parties to the e-mails, the Academy and Delta were involved in a joint defense agreement with Gryphon, and they

-15-

were apprised of the disclosures not long after they were made. Attributing to the Academy and Delta knowledge of the magnitude of the disclosures is therefore reasonable.

The fourth factor the Court considers is "any measures taken to mitigate the damage of the disclosures." *Fox*, 172 F.R.D. at 671. This factor also weighs heavily in favor of waiver. The Academy and Delta became aware of the disclosure, at the latest, on November 13, 2007, when Chris Keegan, counsel for the Gryphon entities, sent a letter to plaintiffs' counsel (to which counsel for the Academy and Delta was copied) identifying the e-mails and requesting their return on grounds of privilege. Plaintiffs' counsel refused this request in a comprehensive response letter. Then, on November 21, 2007, the plaintiffs filed their motion for class certification, referring to portions of the disputed e-mails. The Academy and Delta did nothing to contest the use of these e-mails until March 21, 2008, when they filed the present motion to compel. To put it colloquially, the measures taken by the Academy to mitigate the damage of disclosure are "a day late and a dollar short."

Finally, there is "the overriding interests of justice." *Fox*, 172 F.R.D. at 671. Justice would not appear to be served by sweeping under the rug highly probative documents that were out in the open for so long without vigorous objection. Further, the questionable nature of the privilege claims also figures into this analysis.

The Court concludes, therefore, that the magistrate judge committed clear error in determining that the inadvertent disclosure did not result in waiver of any applicable claims of privilege.

III.

The Court concludes that the magistrate judge committed clear error when she granted in part the defendants' motion to compel the return of certain e-mail documents on the basis that they are protected by the attorney-client privilege.

According, it is **ORDERED** that the plaintiffs' objections to the magistrate judge's order granting in part the defendants' motion to compel [dkt #100] are **SUSTAINED** and the defendants' objections [dkt #105] are **OVERRULED**.

It is further **ORDERED** that the magistrate judge's order granting in part the defendants' motion to compel return of disclosed documents [dkt #94] is **VACATED**.

It is further **ORDERED** that the defendants' motion to compel [dkt #63] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: August 26, 2008

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 26, 2008.

s/Felicia M. Moses
FELICIA M. MOSES